SO ORDERED.

SIGNED this 22nd day of October, 2013.



_____
Dale L. Somers
United States Bankruptcy Judge
_____

Opinion Designated for Electronic Use, But Not for Print Publication
IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In Re:<br><br>JOHN WESLEY KNOWLES and<br>CANDI LYNN KNOWLES,<br><br>        DEBTORS. | CASE NO. 12-11367<br>CHAPTER 7 |
| J. MICHAEL MORRIS, Trustee,<br><br>        PLAINTIFF,<br><br>v.<br><br>PIONEER CREDIT RECOVERY, INC.,<br>and UNITED STATES DEPARTMENT<br>OF AGRICULTURE,<br><br>        DEFENDANTS. | ADV. NO. 12-5155 |

MEMORANDUM OPINION AND ORDER GRANTING
THE TRUSTEE'S UNCONTESTED CLAIM TO AVOID AND RECOVER A
PREFERENTIAL TRANSFER, BUT DENYING HIS CONTESTED CLAIMS
TO AVOID ALLEGED FRAUDULENT TRANSFERS

The Chapter 7 Trustee, J. Michael Morris, filed this action to avoid allegedly

preferential or fraudulent transfers made by Debtor John Wesley Knowles to the United States Department of Agriculture - Rural Housing Service ("RHS") as indemnification for payments made by the RHS to Bankwest of Kansas, the Debtor's mortgage lender under a Department of Agriculture guaranteed loan program. The parties have filed a stipulation of facts and submitted the case on written briefs. The Court has jurisdiction.[1]

For the reasons discussed below, the Court denies the Complaint, except as to the transfer for the benefit of the Department of Agriculture of $1,572.78 by a prepetition wage garnishment. The defendants agree this transfer was preferential and will pay the amount to the Trustee upon the entry of an order.

**FINDINGS OF FACT.**

As its findings of fact, the Court adopts the parties' stipulations,[2] which are supported by attached exhibits and state substantially as follows:

1. On or about February 25, 2005, John W. Knowles ("Debtor") executed and delivered a promissory Note to Bankwest of Kansas ("Bankwest"), whereby he promised to pay Bankwest the sum of $42,000, with interest thereon at 6% per annum. As consideration for the Note, Bankwest made a loan to Debtor.

---

[1] This Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and (b), and the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984. Furthermore, this Court may hear and finally adjudicate this matter because it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F) and (H). There is no objection to venue or jurisdiction over the parties.

[2] Dkt. 17 and 19.

2. The Note was secured by a mortgage on the following described real property:

>   All of Lots Nineteen (19) and Twenty (20), Block One
>   Hundred One (101), North Addition to the City of Colby,
>   Kansas, as shown by the recorded Plat thereof, commonly
>   known as 815 E. 8th Street, Colby, KS 67701.

3. The loan made by Bankwest was guaranteed by the United States of America acting through the Rural Housing Service ("RHS"), an agency of the United States Department of Agriculture ("USDA"). The Loan Note Guarantee ("Guarantee") includes the following: "5. The Loan Note Guarantee will terminate automatically (a) upon full payment of the guaranteed loan; or (b) upon full payment of any loss obligation hereunder; or (c) upon written notice from the Lender to RHS that the guarantee will terminate provided this Loan Note Guarantee is returned to be canceled by RHS."

4. On February 16, 2005, Debtor executed a Request for Single Family Housing Loan Guarantee. The Request includes:

>   I certify and acknowledge that if the Agency pays a loss claim
>   on the requested loan to the lender, I will reimburse the
>   Agency for that amount. If I do not, the agency will use all
>   remedies available to it, including those under the Debt
>   Collection Improvement Act, to recover on the Federal debt
>   directly from me. The Agency's right to collect is
>   independent of the lender's right to collect under the
>   guaranteed note and will not be affected by any release by the
>   lender of my obligation to repay the loan. Any Agency
>   collection under this paragraph will not be shared with the
>   lender.

5. Debtor defaulted on the Bankwest loan, and Bankwest filed a petition of foreclosure on July 23, 2009. On October 26, 2009, a Journal Entry of Judgment was

3

entered in *Bankwest of Kansas v. John W. Knowles*, Case No. 09CV27, Thomas County, Kansas, granting the plaintiff an *in personam* judgment and a judgment of foreclosure, in the amount of $39,662.08, together with interest, costs, and fees as detailed in the Judgment. This was the full amount owed under the loan.

6. A Sheriff's sale was held on December 10, 2009. Bankwest purchased the property for $44,390.02 by issuing a credit bid against the judgment. This bid included all amounts due under the loan and judgment.

7. Bankwest subsequently sold the property, resulting in net proceeds in the amount of $20,280.37. Bankwest then submitted a loss claim to the USDA - RHS in the amount of $21,200.45. On November 26, 2010, the USDA paid Bankwest $20,662.73 on this claim.

8. On April 9, 2011, pursuant to 31 U.S.C. § 3720A, the USDA sent notice to Debtor of the delinquent indebtedness in the amount of $20,662.73, giving Debtor 60 days to respond and assert any defenses; otherwise, the indebtedness would be certified to the Department of the Treasury Offset Program ("TOP"). Debtor did not respond to the notice. On June 11, 2011, the USDA certified the debt to the Department of the Treasury for offset.

9. On or about February 15, 2012, pursuant to 26 U.S.C. § 6402(d), the Department of the Treasury paid Debtor's 2011 federal income tax overpayment to the USDA. The overpayment amount was $6,085. The USDA applied $6,068 to the debt, and the Treasury Department retained a $17 service charge.

4

Case 12-05155    Doc# 24    Filed 10/22/13    Page 4 of 15

10. The Department of the Treasury, pursuant to 31 U.S.C. § 3720, through its agent Pioneer Credit Recovery, Inc., garnished Debtor's wages prepetition in the amount of $2,541.83, which was applied to the debt. The amount of $1,572.78 was garnished within ninety (90) days of the filing of the bankruptcy. The USDA has indicated a willingness to turn the $1,572.78 over to the Trustee, but as of the date of the stipulation, had not done so. The USDA has requested an order approved by Debtor's counsel before making payment to the Trustee.

11. The Chapter 7 bankruptcy case was filed May 25, 2012.

12. Debtors included the following entities on the mailing matrix for notice in their bankruptcy case:[3] Bankwest of Kansas, Pioneer Credit Recovery, US Department of Treasury (Debt Management Services), Department of the Treasury (Financial Management Services), and US Department of Agriculture. The address listed for the USDA does not comply with District of Kansas Local Bankruptcy Rule 2002.2.

13. On July 16, 2012, the Trustee made demand on Pioneer Credit Recovery for avoidance and recovery of the preferential transfer effected through wage garnishment. *See* ¶ 10. No response was received and this adversary action was filed September 24, 2012.

14. Debtor was insolvent on the dates when (a) the Department of the Treasury paid the USDA the Debtor's 2011 federal income tax overpayment, *see* ¶ 9 above (the

---

[3] The addresses are listed in the stipulation, but omitted above for simplicity.

5

Case 12-05155    Doc# 24    Filed 10/22/13    Page 5 of 15

"set-off"), and (b) Debtor's wages were garnished prepetition, *see* ¶ 10 above. The set-off and all such garnishments occurred within two (2) years of the filing of the bankruptcy case.

**DISCUSSION.**

**A. The parties' positions.**

As found above, Debtor obtained a loan from Bankwest, secured by his residence, and guaranteed by the RHS. After Debtor's default, Bankwest obtained a judgment against Debtor for the full debt owed, foreclosed the mortgage to satisfy the judgment, and, at the sheriff's sale, bid in the full amount of the judgment and other amounts owed. Bankwest subsequently sold the property for less than the bid amount, and sought recovery of the difference from the RHS under the Guarantee. The RHS paid the claim and sought reimbursement from Debtor, causing his 2011 federal income tax refund of $6,068 to be offset, and garnishing his wages in the amount of $2,541.83. The RHS agrees that $1,572.78 of the garnishments was preferential because obtained within 90 days of the filing of the petition. The Trustee seeks to recover the IRS offset and the remaining garnished wages of $969.05 as fraudulent transfers.

The Trustee's theory of recovery is simple. He contends that the RHS's Guarantee automatically terminated when Bankwest bid in the amount owed by Debtor at the foreclosure sale. He relies upon the fact that the Guarantee provides that it shall terminate upon "full payment of the guaranteed loan" and that Bankwest's bid at the foreclosure sale constituted full payment of the guaranteed debt under Kansas law. Therefore,

6

according to the Trustee, because the Guarantee terminated, the payments made by the RHS to Bankwest were gratuitous and may be recovered by the Trustee for the benefit of the estate. The RHS argues that the Guarantee did not terminate, that its obligation to pay Bankwest under the Guarantee is not dependent upon Kansas law, that USDA regulations authorized the payment made to Bankwest, and that Debtor agreed in the certification to the Request for Single Family Housing Loan Guarantee to indemnify the RHS for the amount paid to Bankwest.

**B. Under Kansas mortgage foreclosure law, a judgment creditor has no deficiency claim against the debtor following a full credit bid.**

There is no question that under Kansas mortgage law, when a creditor is granted a judgment on a note secured by a mortgage, the mortgage is foreclosed, the property is sold to the judgment creditor by credit against the judgment, and the sale is confirmed, the amount of any deficiency judgment is determined by the simple mathematical calculation of the difference between the judgment amount and the bid amount.[4] When the amount the creditor bids is the full amount owed by the judgment debtor, a full credit bid, the mathematical calculation results in no deficiency. The creditor cannot thereafter recover anything from the judgment debtor, even if the property is later sold by the creditor for substantially less than the amount of its credit bid. Because the creditor purchased the property for the full amount of the debt, the debt is deemed to have been paid in full, even thought the creditor has not received any cash payment. In this case, Bankwest bid the

---

[4] *Federal Land Bank v. Cummings*, 12 Kan. App. 2d 134, 137-38, 735 P.2d 1110, 1113 (1987).

7

full amount owed, and it has no claim against Debtor for the difference between the credit bid and the amount Bankwest later received when it sold the property to a third party.

### C. Bankwest's full credit bid did not terminate the Guarantee.

The question here is the impact of the Kansas full-credit-bid rule on the right of Bankwest to receive payment under the Guarantee. That agreement provides that "[t]he Loan Note Guarantee will terminate automatically (a) upon full payment of the guaranteed loan; or (b) upon full payment of any loss obligation hereunder; or (c) upon written notice from the Lender to RHS that the guarantee will terminate provided this Loan Note Guarantee is returned to be canceled by RHS." The Trustee contends that the phrase stating the Guarantee "will terminate automatically . . . upon full payment of the guaranteed loan" is unambiguous and was triggered by Bankwest's full credit bid. Evaluation of the Trustee's position requires the Court to apply rules of contract construction to the Guarantee.

As stated by the Trustee in his reply brief, "'When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private parties.'"[5] Determining the intent of the parties is the ultimate goal of contract interpretation. "The whole agreement should, if possible, be construed so as to conform to an evident consistent purpose, and a court should interpret

---

[5] Dkt. 22 at 3 (*quoting Franconia Assocs. v. United States*, 536 U.S. 129, 141 (2002)).

the contract in a manner that makes the contract internally consistent."[6] "Contracting parties are presumed to contract in reference to the existing law."[7] All existing applicable regulations must be read into the contract just as if an express provision to that effect were inserted in the contract.[8]

The Guarantee was issued by the USDA, acting through the RHS, under Title V of the Housing Act of 1949 (42 U.S.C. § 1472), and a program established by the Cranston-Gonzalez National Affordable Housing Act of 1990,[9] and amended in 2004 to be called the "Doug Bereuter Section 502 Single Family Housing Loan Guarantee Program," codified at 42 U.S.C. § 1472(h).[10] Under that program, guaranteed loans are made only to low- or moderate-income families or those whose income does not exceed 115 per cent of the median income of the area.[11] Preference is given to first-time home buyers or veterans, their spouses, or children of deceased veterans.[12] A guaranteed loan may only be used to purchase or build a single-family residence for the borrower; the borrower

---

[6] 17A Am. Jur. 2d *Contracts* § 376 (obtained from Westlaw at AMJUR CONTRACTS § 376, database updated Aug. 2013).

[7] *Id*. at § 371 (obtained from Westlaw at AMJUR CONTRACTS § 371).

[8] *Id*.

[9] Pub. L. No. 101-625, § 706(b) (1990), 104 Stat 4079.

[10] Act of Aug. 4, 2004, P.L. 108-285, § 3, 118 Stat. 917.

[11] 42 U.S.C. § 1472(h)(3).

[12] 42 U.S.C. § 1472(h)(5); 7 C.F.R. § 1980.353(b).

must be eligible for assistance; and the residence must be located in a rural area.[13] The loans are targeted to areas that have a demonstrated need for additional sources of mortgage financing for low- and moderate-income households.[14]

The Guarantee provides for payment to Bankwest of the lesser of (1) any loss of an amount equal to 90 percent of the principal amount actually advanced to Debtor, or (2) any loss "of an amount up to 35 percent of the principal amount actually advanced to [Debtor], plus 85 per cent of any additional loss sustained by [Bankwest] of an amount up to the remaining 65 percent [of] the principal amount actually advanced to [Debtor]." It provides the guaranteed loss shall cover interest to the date of the final loss settlement if Bankwest liquidates the collateral in an expeditious manner, in which circumstance, the "[n]et proceeds received from liquidation of the collateral will be used in calculating the amount of loss sustained by [Bankwest]." It further provides that "[a]ny amount due under this instrument will be determined and paid, as provided in 7 CFR Part 1980, Subpart D in effect on the date of this instrument."

The referenced regulations provide further detail about the liquidation of collateral and the calculation of the guaranteed loan loss. If a borrower of a guaranteed loan cannot make a loan payment, the lender is required to assist the borrower or liquidate the loan.[15] If a lender concludes that a loan must be liquidated, the lender is to notify the RHS of the

---

[13] 42 U.S.C. § 1472(h)(4).

[14] 42 U.S.C. § 1472(h)(11).

[15] 7 C.F.R. §§ 1980.309(f); 1980.371; 1980.374.

10

Case 12-05155   Doc# 24   Filed 10/22/13   Page 10 of 15

decision and initiate a foreclosure within 90 days.[16] The lender must proceed in an expeditious manner and is expected to make the maximum collection possible on the indebtedness.[17] The lender is directed to "consider the possibility of recovery of any deficiency apart from the acquisition or sale of collateral" and to "submit a recommendation on such recovery considering the borrower's assets and ability to pay, prospects of future recovery, the costs of pursuing such recovery, recommendation for obtaining a judgment, and the collectability of a judgment in view of the borrower's assets."[18]

Loss payments in settlement of a guarantee under the housing program are made within 60 days of the lender's properly filed claim.[19] The loss payment is determined by applying the net proceeds from the property to the unpaid debt.[20] The net proceeds are defined differently, depending upon which of three circumstances is involved. First, if at liquidation, title to the property is conveyed to a bona fide third-party purchaser, the loss payment is based upon the net sale proceeds received for the property.[21] Second, "[i]f, at liquidation, title to the property is conveyed to the Lender, then the Lender must prepare

---

[16] 7 C.F.R. § 1980.374.

[17] 7 C.F.R. § 1980.374(a) and (b).

[18] 7 C.F.R. § 1980.374(b).

[19] 7 C.F.R. § 1980.376(a).

[20] 7 C.F.R. § 1980.376(a)(1).

[21] 7 C.F.R. § 1980.376(a)(1)(i).

and submit a property disposition plan to RHS for RHS concurrence."[22] The plan must address the proposed method of sale, the estimated value and minimum sale price, the estimated costs of sale, and any other information that could impact the loss on the loan. The lender is allowed 6 months to sell the property. For purposes of determining the loss payment under this second alternative, the loss payment "will be based on the net proceeds received for the property when the sale is conducted in accordance with the plan as approved by RHS."[23] Third, "[i]f a deficiency judgment is obtained, the Lender must enforce the judgment against the borrower before loss settlement if the current situation provides a reasonable prospect of recovery. A loss payment will be made when the Lender holds a deficiency judgment but there are not current prospects of collection, even if there may be in the future."[24]

As the RHS contends, the Court finds that automatic termination of the Guarantee was not triggered by Bankwest's full credit bid at the foreclosure sale. Since, under the terms of the Guarantee and the applicable regulations, the amount of the bid is irrelevant to the calculation of the loss to be paid to Bankwest, a full credit bid does not equate to payment in full. Implicit in the Trustee's position that the Guarantee was automatically terminated by Bankwest's full credit bid is the use of Kansas law for construing the

---

[22] 7 C.F.R. § 1980.376(a)(1)(ii).

[23] *Id*. A different net proceeds calculation would apply if the lender could not make a sale during the 6 months, but Bankwest apparently made a timely sale of the property in this case.

[24] 7 C.F.R. § 1980.376(a)(1)(iii).

12

Guarantee. The RHS's reliance on federal law, particularly the USDA regulations for the housing program, rather than state law, to construe the Guarantee is fully supported by general principles of contract construction which direct that applicable regulations be read into the Guarantee.

The RHS's position is also supported by *Shimer*,[25] a United States Supreme Court opinion construing the Veterans' Administration's guarantee of a mortgage loan under Title III of the Servicemen's Readjustment Act of 1944, as amended. In *Shimer*, where the effect of a Pennsylvania anti-deficiency statute was in issue, the Supreme Court held that the applicable regulations made "clear that they were intended to create a uniform system for determining the [Veterans'] Administration's obligation as guarantor, which in its operation would displace state law."[26] The Supreme Court reasoned that the regulations spelled out the method for determining the loss after a sale "in such great detail that there can be little doubt of an administrative intent that such method should provide the exclusive procedure."[27] Although as noted by the Trustee, there are factual distinctions between *Shimer* and this case, those distinctions do not detract from the importance of the *Shimer* rationale to loan guarantee programs other than the one involved there. In this case, the USDA regulations define the loss payment on the guaranteed loan made by Bankwest in such detail that the Court is confident the

---

[25] *United States v. Shimer*, 367 U.S. 374 (1961).

[26] *Id*. at 377.

[27] *Id*. at 379.

13

regulations provide the exclusive procedure and displace Kansas law. Likewise, the Court is unpersuaded by the Trustee's arguments distinguishing other cases cited by the RHS in support of the proposition that the Kansas law full-credit-bid rule does not bar Bankwest's loss claim under the Guarantee.[28]

The Court therefore concludes that the Guarantee did not terminate when Bankwest at the mortgage foreclosure sale bid the full amount owed by Debtor to Bankwest, leaving no deficiency judgment. Although Kansas law determined Debtor's liability to Bankwest after the sale, it did not determine the obligation of the RHS to Bankwest under the Guarantee.

### D. The RHS properly paid the loss to Bankwest.

In this case, Bankwest liquidated the collateral and, after purchasing the mortgaged premises at the foreclosure sale, sold the property to a third party. It calculated its loss in accord with the applicable regulations. The Trustee does not challenge that calculation. The RHS paid the loss to Bankwest. The payment was not gratuitous.

### E. Debtor was obligated to the RHS for the amount it paid to Bankwest.

Debtor agreed in the acknowledgment and certification portion of the Request for Single Family Housing Loan Guarantee that if the RHS "pays a loss claim on the requested loan to the lender, I (We) will reimburse the Agency for that amount." The payments which the Trustee seeks to recover as fraudulent transfers were made in

---

[28] *See* cases cited by the RHS in its brief, dkt. 21 at 8-10, and the Trustee's response, dkt. 22 at pages 6-8.

fulfillment of Debtor's obligation to indemnify the RHS for valid, non-gratuitous payments to Bankwest. The amount garnished from Debtor's wages and the amount of Debtor's IRS refund offset in payment to the RHS may not be recovered as fraudulent transfers.

**CONCLUSION.**

For the foregoing reasons, the Trustee's claim to recover Debtor's 2011 federal tax refund and $969.05 of the prepetition wage garnishments as fraudulent transfers is denied, and as agreed by the parties, the claim to recover $1,572.78 of the prepetition wage garnishments as preferential transfers is sustained.

The foregoing constitutes Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure, which makes Rule 52(a) of the Federal Rules of Civil Procedure applicable to this proceeding. A judgment based upon this ruling will be entered on a separate document as required by Federal Rule of Bankruptcy Procedure 7058, which makes Federal Rule of Civil Procedure 58 applicable to this proceeding.

**IT IS SO ORDERED.**

# # #